UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LILLIAN HERMES,

        Plaintiff,

v.                                                                                             Case No. 16-C-1281

NANCY A BERRYHILL,

        Defendant.

## DECISION AND ORDER

Plaintiff Lillian Hermes filed this action challenging the decision of the Acting Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. She contends that the decision is not supported by substantial evidence. In particular, she asserts that the Administrative Law Judge (ALJ) failed to fully develop the record because she did not properly consider Hermes' impairments in combination with each other and she substituted her own opinions for those of medical professionals who examined Hermes. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## BACKGROUND

Hermes filed applications for disability, disability insurance benefits, and supplemental security income on March 20, 2013, alleging that she has been disabled since July 1, 2010, as a result of bipolar disorder, insomnia, fibromyalgia, anxiety, depression, and a learning disability. R. 149, 164. At the time of her applications, Hermes was age 32 and lived at a homeless shelter in Manitowoc, Wisconsin. R. 149. During the four years preceding 2010, she worked primarily as a

seasonal housekeeper in Door County, Wisconsin, for approximately five months at a time during the spring, summer, and early fall. R. 84–86, 1251. She also supplemented the seasonal cleaning work with seasonal kitchen work, including as a cook and washing dishes. R. 85, 1251. Although she walked out on some of these jobs—as she has with other jobs, over the years—she was also hired back each season because the employers appreciated the quality of her work. R. 57–58, 90. She stopped working the seasonal jobs in Door County only because it was too expensive for her to commute or live up there. R. 88.

Since filing her applications in 2010, Hermes has worked irregularly for short periods of time. For a few weeks in the late spring and early summer of 2010, she worked as a house cleaner in Door County, but she stopped working that job because she was experiencing pain from the bending the work required and, in any event, she could no longer travel to it due to car troubles. R. 57. For a short time in 2012 Hermes worked at The Linen Press in Sturgeon Bay, where she ran cleaned cloth napkins through a press machine, but she walked out on that job "because of blowing up with [her] supervisor and . . . manager" after feeling disrespected by them. R. 57–58. In April 2015, she also worked for several hours in the City of Kewaunee water plant as part of a training placement through the Division of Vocational Rehabilitation (DVR) within the Wisconsin Department of Workforce Development. R. 57–58, 1254–63.

Hermes' benefits applications were denied both initially in September 2013 and on reconsideration in February 2014. R. 163, 178, 200, 218. She requested a hearing before an Administrative Law Judge (ALJ), and ALJ Roxanne J. Kelsey held a hearing on November 5, 2015. R. 52, 235–36. At the hearing, Hermes, her boyfriend Eric Fonseca, and Vocational Expert Timothy Tansey all testified. R. 53.

In a comprehensive twenty-seven page decision dated April 21, 2016, the ALJ determined that Hermes is not disabled. R. 44–45. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). R. 20–21. At step one, the ALJ concluded that Hermes met the insured status requirements through March 31, 2014, and that she has not engaged in substantial gainful activity since July 1, 2010, the onset date of her alleged disability. R. 21. At step two, the ALJ concluded that Hermes has five severe impairments: fibromyalgia, depression, anxiety, substance addiction, and a personality disorder. R. 22.

At step three, the ALJ concluded that Hermes did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22. Specifically, the ALJ considered listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders) and determined that Hermes did not have a sufficient combination of marked impairments and repeated episodes of decompensation to satisfy the "paragraph B" criteria for any of those listings. R. 22-23. Nor did the evidence support the existence of any listing's "paragraph C" criteria. R. 23–24. The ALJ next assessed Hermes' residual functional capacity and found that she can perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). R. 24. Regarding this capacity, the ALJ found that Hermes could engage in "unlimited climbing of ladders, ropes, or scaffolds and frequent climbing of ramps and stairs" and that she "may frequently stoop, kneel, crouch, and crawl." R. 24. Although moderate limitations in her pace would preclude her from performing work at a production or assembly-line pace, the ALJ found she could handle work that allows a more flexible pace. R. 24. Finally, the ALJ found that Hermes "would be absent or tardy

3

or need to leave early about once every other month because of symptoms" and that she "may have occasional, brief, and superficial contact with supervisors, coworkers, and the general public because of moderate difficulties in social functioning." R. 24.

In support of this residual functional capacity conclusion, the ALJ engaged in a detailed, nineteen-page discussion of the record. R. 24–43. After summarizing hearing testimony by Hermes and her boyfriend, the ALJ methodically outlined Hermes' available medical records, some of which date to 2008, and explained that this "review of the longitudinal record establishes a history of mental health treatment and polysubstance dependence." R. 27. Rather than reproduce this comprehensive review of Hermes' medical records—which the ALJ helpfully supported with frequent and precise citations to particular pages within the record exhibits—the ALJ's summary of the record encapsulates her findings:

> The record clearly documents a history of mental health treatment with symptoms of depression and anxiety as well as elements of a personality disorder. However, these records also show that the claimant tends to experience exacerbated symptoms when she is abusing substances, including abuse of prescription medication. Her involvement in volatile personal relationships only serves to compound the problem. Notwithstanding, the record documents this history going back to at least 2008, yet, the claimant has been fairly consistent with regard to performing seasonal housekeeping work despite her substance abuse and relationship issues. The claimant has admitted that she has walked off several jobs due to conflict but also testified that her employers have rehired her when the season begins because she was a good worker who was very detail oriented and willing to work hard. . . .
>
> Mental status examinations have typically shown a logical thought process and intact memory but show agitation when the claimant is experiencing problems related to obtaining medication or does not feel that treating sources are in agreement with her diagnoses and resulting limitations.

R. 39–40. Hermes takes issue with the ALJ's treatment of particular documents and opinions within her medical records, and those sources will be discussed in greater detail as in the analysis below.

4

Based on the residual functional capacity determination, the ALJ found that Hermes is capable of performing her past relevant work as a housekeeper. R. 43. This conclusion relied on the vocational expert's characterization of Hermes' past housekeeper work as unskilled, light in exertional demand, and performed at the medium level. R. 43. In the alternative, the ALJ also found that Hermes is capable of performing other jobs that exist in the national economy, citing the positions of handpacker, cafeteria attendant, and mail clerk, all identified by the vocational expert at the hearing. R. 43–44.

After finding that Hermes could perform past relevant work or, in the alternative, that she could perform other work that exists in significant numbers in the national economy, the ALJ found that Hermes had not been under a disability since her alleged onset date on July 1, 2010. R. 44–45. Hermes requested that the Appeals Council review the ALJ's decision, but the Appeals Council declined to do so. R. 1, 14. Hermes thereafter sought review in this court.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 404 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and her conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Hermes asserts that the ALJ erred by concluding that, despite her severe impairments of fibromyalgia, depression, anxiety, substance addiction, and a learning disability, she possesses the residual functional capacity to perform past relevant work and therefore is not disabled. Arguing that the ALJ's decision is not supported by substantial evidence, Hermes contends that the ALJ did not adequately develop the record because she failed to consider Hermes' impairments in combination with each other and she substituted her own opinions for those of examining medical experts.

**I. Hermes' Combination of Impairments**

Although a heading in Hermes's opening brief asserts that the ALJ failed to consider Hermes' impairments in combination with one another, Hermes makes only cursory reference to this contention throughout the remainder of her argument. Under 42 U.S.C. § 423(d)(2)(B),

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability insurance benefits], the Commissioner of Social

6

> Security shall consider *the combined effect of all of the individual's impairments* without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered *throughout the disability determination process*.

(Emphasis added.) There is no dispute that "[w]hen an applicant has several medical problems, the ALJ must consider her condition as a whole." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005) (per curiam) (citing *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004)).

To the extent she develops this combination argument, Hermes asserts that her "combination of impairments would limit her functioning in a workplace because it is the episodic nature of her disorder that would maker her continuing productive functioning extremely difficult for her." ECF No. 10 at 9. As evidence of her "unstable behavior," she cites to the DVR progress notes for her April 21, 2015 shift at the City of Kewaunee Water Plant. *Id.* Those notes recount a discussion between Hermes and her case manager in which Hermes described at length problems throughout her employment history, including her tendency to walk out on jobs after becoming angry with coworkers and an incident in which she lost a job after a coworker "snitched" on her for "doing weed on break in the bathroom." R. 1260. Yet the ALJ's opinion *does* account for the episodic nature of Hermes' disorder, noting that her residual functional capacity "has been limited to work allowing a flexible pace with social limitations, and an ability to be absent, tardy, or a need to leave work early once very other month due to symptoms." R. 40. The ALJ's opinion likewise accounts for Hermes' fibromyalgia by noting that her residual functional capacity is also "limited to a reduced range of light work . . . consistent with her past work as a housekeeper/cleaner." R. 41.

Moreover, the DVR records in their entirety undermine Hermes' arguments because they show that her combination of impairments does not preclude her from functioning productively in

7

an employment setting. During her time at the Kewaunee water plant in the spring of 2015, she consistently arrived on time and dressed appropriately for her position. R. 1258–62. On April 9, 2015, she responded well to constructive criticism from her case manager, who reminded her to pay close attention to detail after observing her leaving visible dust and debris on desks and the floor while cleaning. R. 1262. After receiving that feedback, Hermes showed initiative on April 14, 2015, by beginning to work before her case manager arrived and cleaning extra areas not normally a part of her end-of-shift cleaning routine. R. 1261–62. On April 24, 2015, Hermes mentioned to her case manager that she felt a great deal of pain after working on April 21, but she also declined any help moving boxes as part of an assignment taking inventory of water meters. R. 1258–60. Her case manager's notes show that she independently performed basic data entry tasks on a regular basis after receiving only minimal instruction. R. 1258–60. Indeed, although the DVR records contain the April 21 comments in which Hermes recounted her *past* work struggles for her case manager, there is no indication that the underlying conversation itself reflected a "blow up" or situation where Hermes was likely to "walk out" on the water plant or her case manager. Consequently, these DVR records taken as a whole indicate that there is substantial evidence to support the ALJ's determination that Hermes' combination of impairments does not prevent her from functioning in an employment setting, subject to the identified limitations.

**II. Medical Expert Opinion**

Hermes also argues that the ALJ's opinion is not supported by substantial evidence because she substituted her own opinions for the opinions of qualified medical professionals. An ALJ's "decision must be based on testimony and medical evidence in the record, and the [ALJ] 'cannot make his own independent medical determination about the claimant.'" *Scivally v. Sullivan*, 966

F.2d 1070, 1076 (7th Cir. 1992) (quoting *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985)). For example, the Seventh Circuit has noted that, in the absence of expert medical evidence, it was "improper for the ALJ to make his own determination regarding the prognosis of recovery should [the claimant] stop smoking" based on common knowledge about the adverse health effects of chronic smoking. *Rousey*, 771 F.2d at 1071. Here, Hermes argues that the ALJ improperly discounted two opinions in the record: that of Dr. Kurt Weber, an independent psychologist who conducted a consultative examination, and that of the DVR, which conducted an assessment of Hermes before she began her vocational rehabilitation program. A review of the ALJ's decision, however, demonstrates that she considered both of these opinions and explained what weight she gave them and why. The fact that the ALJ did not adopt these opinions does not mean that she did not consider them. In light of all the evidence, the ALJ's decision to assign them less weight was not unreasonable. It certainly does not mean she merely imposed her own medical judgment.

Dr. Weber evaluated Hermes on August 30, 2013. R. 1120. He opined that she experiences moderate limitations in her ability to understand, remember, and carry out simple instructions, as well as moderate to marked limitations in her ability to respond appropriately to supervisors and co-workers, withstand routine work stresses, adapt to changes in the work environment, and maintain concentration, attention, and work pace. R. 1124. Dr. Weber's report notes that these "opinions are offered on the sole basis of the examinations and psychological assessments administered at this time." R. 1124. The notes throughout Dr. Weber's report illustrate the extent to which he relies on Hermes' subjective reports. For example, his brief note regarding her work history recounts Hermes' statement that she left her last position "as a result of 'not being able to make it work.'" R. 1120. Elsewhere Dr. Weber notes regarding Hermes' work performance that she "reports having

9

been fired from work positions as a result of her 'attitude.'" R. 1122. Other observations throughout the report comment on Hermes' demeanor and lack of cooperation on the day of the evaluation, as well as her responses to two intelligence and achievement tests administered as part of the same evaluation.

Although the ALJ's opinion expressly "accords less weight" to the opinion of Dr. Weber than to other opinions in the record, the ALJ also accepts Dr. Weber's opinion that Hermes experiences moderate limitations in her ability to withstand work stresses and maintain concentration, persistence, and pace. R. 41–42. However, the ALJ's opinion departs from Dr. Weber because the ALJ "does not find any more than moderate limitations in social functioning." R. 42. The ALJ assigned little weight to Dr. Weber's opinion because it was "based primarily upon [Hermes'] performance as well as her subjective reports during [the] examination." R. 42. The ALJ also compares Dr. Weber's opinion with the DVR records from Hermes time at the Kewaunee water plant, which show that she has "recently demonstrated an ability to perform work activity and accept direction and criticism without evidence of conflict." R. 42. Consequently, the ALJ's decision rejects a portion of Dr. Weber's social functioning opinion that is "inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Rejection of a medical provider's opinion based on contrary record evidence does not amount to the ALJ improperly exercising independent medical judgment.

The ALJ likewise did not improperly substitute her own opinion for that of the DVR by assigning no weight to an October 2014 functional assessment, which evaluates Hermes as having a "serious limitation" in three functional categories. R. 1277–78. First, the functional assessment rates Hermes as having a serious limitation with regard to communication skills, citing her report that

10

she received special education services for behavioral reasons during school. R. 1277. Second, it rates her as having a serious limitation with regard to interpersonal skills because "[h]er acting out behaviors have the potential to cause difficulty with acceptance by supervision [*sic*] and coworkers and customers in any work environment." R. 1278. Finally, it rates her as having a serious limitation with regard to work tolerance given her "physical . . . and emotional disabilities" and her "limited work experience," which mean that she "will need a work environment that meets her needs." *Id.* This last functional category assessment also notes that "[s]tress exacerbates her symptoms" and that "[s]he has indicated [that] when stressed she has difficulty with concentration and memory." *Id.*

The ALJ assigned no weight to these cursory assessments, however, not only because they "seem to be based upon [Hermes'] subjective reports of limitations" but also because DVR "has different rules than the [SSA] with regard to functional limitations and their effect on an individual's ability to perform work activity." R. 42. For example, the other functional categories in the short assessment—mobility, self-care, self-direction, work skills—rate Hermes as having "no serious limitation." R. 1277–78. Nothing in the record explains how to translate the DVR assessment's facially binary choice between "serious" and "not serious" impairments into the more subtle five-point scale of none, mild, moderate, marked, or extreme that the SSA uses to evaluate impairment severity. Indeed, had the ALJ uncritically relied on this functional assessment's characterization of Hermes' impairments, she would have risked issuing a decision that was not supported by substantial evidence.

Furthermore, rather than impose her own opinion regarding Hermes' medical evidence, the ALJ's decision relies on the opinions of state agency physicians. Specifically, the ALJ's opinion accords great weight to the opinions of Ronald Shaw, M.D., and Esther Lefevre, Ph.D., who

11

assessed Hermes' physical and mental residual functional capacities, respectively, at the reconsideration level, as well as to the opinion of Junko McWilliams, Ph.D., who assessed Hermes' mental residual functional capacity at the initial level. R. 41. The ALJ also accords less weight to the opinion of Lewis Cylus, M.D., who assessed Hermes physical residual functional capacity at the medium exertional level. R. 41. Notably, the state agency physicians' decisions on reconsideration expressly distinguish Dr. Weber's "overestimate of the severity of [Hermes'] restrictions/limitations . . . based only on a snapshot of [her] functioning" that "relies heavily on the subjective report of symptoms and limitations provided by" Hermes. R. 198, 216. Elsewhere the decisions note that Hermes "reported symptoms well in excess of those reported to her primary providers at this exam" with Dr. Weber. R. 194, 212. Thus, far from disregarding opinion evidence in the record, the ALJ's decision actually embraces medical opinion evidence that directly undermines the report from Dr. Weber on which Hermes would prefer to rely.

The Seventh Circuit's decision in *Carradine v. Barnhart* does not, as Hermes argues, require reversal in this case on the grounds that the ALJ improperly disregard Hermes' subjective symptoms of pain. 360 F.3d 751 (7th Cir. 2004). In *Carradine*, an ALJ denied benefits after determining that a claimant's severe physical impairments "were not a plausible cause of disabling pain," but the Seventh Circuit reversed on the grounds that the ALJ "failed to take seriously the possibility that the pain was indeed as severe as Carradine said but that its origin was psychological rather than physical." *Id.* at 755. The Seventh Circuit explained that "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Id.* at 753 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)). Unlike in *Carradine*, however, the

12

ALJ here arrived at her decision not because she found Hermes' complaints patently incredible given the diagnosis, but because she assigned little weight to the opinion furnished by a provider who relied heavily on Hermes' self-reported symptoms. An ALJ may properly give less weight to a psychologist's opinion where it is based only on the claimant's self-reported symptoms, particularly where the psychologist gives an opinion after meeting the claimant only once and offers little analysis. *See Ziegler v. Astrue*, 336 F. App'x 563, 569–70 (7th Cir. 2009) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)). Accordingly, *Carradine* does not control.

Finally, aside from her arguments on the merits of the ALJ's decision, Hermes also cites the Seventh Circuit's decision in *Bjornson v. Astrue* to criticize the ALJ's alleged use of "boilerplate" in her opinion. 671 F.3d 640 (7th Cir. 2012). In *Bjornson*, the Seventh Circuit expressed frustration with the use of "boilerplate language [that] fails to inform [the court] in a meaningful, reviewable, way of the specific evidence that the ALJ considered in determining that [the] claimant's complaints were not credible." *Id.* at 645 (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). Hermes suggests that the following statement by the ALJ is conclusory boilerplate, and she implies that it undermines the reliability of the ALJ's decision:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements and those of her boyfriend concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence for the reasons explained in the decision.

R. 27. If the ALJ's opinion turned on that sentence alone, reversal might be appropriate. But what Hermes fails to acknowledge is that this sentence introduces a discussion of Hermes' medical record that covers thirteen pages—essentially *half*—of the ALJ's opinion. R. 28–40. After that, the ALJ spends an additional two pages methodically discussing the weight assigned to several medical

13

opinions that appear in the record. R. 41–43. This thorough discussion of the evidence provided the court with more than meaningful reasoning to consider when conducting its review, and the use of a summary sentence to introduce that detailed discussion in no way undermines the conclusions that the analysis ultimately supports.

## CONCLUSION

For the reasons given above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

Dated this 29th day of December, 2017.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court
